**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No.  09-10150-MLW |
| | ) | |
| JULIAN MILLER a/k/a | ) | |
| JUICE MILLER | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT**
**JULIAN MILLER'S SENTENCING MEMORANDUM**

The United States of America, by and through Assistant U.S. Attorney Maxim Grinberg, files this opposition to the defendant's, Julian Miller's, sentencing memorandum ("Def's Sent. Mem.") in connection with the defendant's nine-count conviction for bank robberies under 18 U.S.C. § 2113(a).  The defendant recommends that this Honorable Court impose a 48-month sentence consecutive to the state sentence he is currently serving for the robberies he committed in the state of New York.  The government recommends that this Honorable Court sentence the defendant to a **131-month** term of imprisonment to run concurrently with the defendant's state sentence, followed by a 3-year term of supervised release, and order restitution in the amount of $22,757.72.

The government arrives at the 131-month term of imprisonment by calculating the defendant's Guideline sentencing range, which is 151-188 months; then using 169 months as a baseline reference point to reflect the defendant's conduct and history; and finally subtracting 38 months to account for the time the defendant already spent in state custody for robberies in New York.

**I.  THE DEFENDANT'S GUIDELINE SENTENCING RANGE IS 151-188 MONTHS.**

**A.  THE UNDISPUTED GUIDELINE CALCULATION PRODUCES A SENTENCING RANGE OF 151-188 MONTHS.**

The defendant does not dispute that he is a career offender under the Guidelines, because the convictions at issue are for bank robbery, which is a crime of violence, and because he has prior convictions for possession with intent to distribute, Presentence Report ("PSR") ¶ 115; distribution, PSR ¶ 117; and robbery, PSR ¶ 119; all within the prescribed time periods of the career offender section, U.S.S.G. § 4B1.2(c).  Because the maximum term of imprisonment under 18 U.S.C. § 2113(a) is 20 years, the defendant's offense level, after subtracting 3 levels for his acceptance of responsibility, is 29, PSR ¶ 107, and his criminal history category is VI, PSR ¶ 123, resulting in the sentencing guideline range of 151-188 months.  See U.S.S.G. § 4B1.1.[1]

**B.  THE COURT SHOULD GIVE DUE CONSIDERATION TO THE DETERMINATION THAT THE DEFENDANT IS A CAREER OFFENDER UNDER THE SENTENCING GUIDELINES.**

Notwithstanding the parties' agreement to the calculation of the applicable sentencing guideline range, the defendant contends

---

[1] The defendant concedes that the Court cannot credit the defendant his undischarged sentence in New York under U.S.S.G. § 5G1.3(b) because the defendant's offense of conviction in New York does not constitute relevant conduct for the offense of conviction here.  Def. Sent. Mem. 15; PSR p. 42-43.

that the Court should disregard the career offender provision of the Sentencing Guidelines because "an exceedingly high guideline range to be applied to a defendant like Miller does not incorporate the purpose and factors set forth in [18 U.S.C.] § 3553(a) that ensure a fair, efficient, and effective sentences."  Def. Sent. Mem. 12.

In criticizing the Sentencing Commission's approach to calculating sentences for career offenders, in that the Sentencing Commission supposedly "deviate[d] from its traditional [reliance] on empirical study of sentencing practices and consequences," Def. Sent. Mem. 12, the defendant overlooks the plain Congressional mandate set forth in 28 U.S.C. § 944(h) to sentence career offenders at or near the statutory maximums and the Supreme Court precedent recognizing and upholding that mandate. *See United States v. LaBonte*, 520 U.S. 751, 758 (1997) ("Congress has expressly provided enhanced maximum penalties for certain categories of repeat offenders in an effort to treat them more harshly than other offenders"); *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 571 (2007) (through enactment of 28 U.S.C. § 994(h), Congress required "the Sentencing Commission to set Guidelines sentences for serious recidivism offenders 'at or near' the statutory maximum").  When the Sentencing Commission attempted to provide a more lenient definition for the phrase "a term of imprisonment at or near the maximum term authorized," the Supreme

Court struck it down as inconsistent with the explicit Congressional mandate that career offenders be sentenced at or near the "'highest' term prescribed for a specific offense." *LaBonte*, 520 U.S. at 758.

Thus, whether or not the Sentencing Commission looked at empirical data in establishing sentence ranges for career offenders, the career offender guideline derives from the clear Congressional mandate set forth in 28 U.S.C. § 994(h).  In this case, the defendant's statutory maximum term of imprisonment is 20 years on each of the nine counts.  *See* 18 U.S.C. § 2113(a).  The Guideline calculation yields a sentencing range of 151-188 months (12.6-15.7 years) on all counts; the government's Guideline sentencing baseline determination, as explained in the next section, results in 169 months (14.1 years); and the government's final recommendation after subtracting 38 months for the time the defendant served on his New York sentence is 131 months (10.9 years), almost half the statutory maximum penalty; while the defendant's recommended sentence of 48 months (4 years), which the defendant characterizes as "a modest variance," Def. Sent. Mem. 9, has no connection whatsoever with the Congressional mandate in 28 U.S.C. § 994(h) or the defendant's offense conduct and history.

The defendant's reliance on the language in *Kimbrough v. United States*, 128 S. Ct. at 575, that the district court is free to disregard policy considerations of the Sentencing Commission

that "do not exemplify the Commission's exercise of its characteristic institutional role" does not apply to this case. The holding in *Kimbrough* pertains to the Sentencing Commission's adoption of the 100-to-1 crack cocaine-to-powder cocaine quantity ratio, which the Supreme Court found was not expressly provided for in 21 U.S.C. § 841, the statute that prescribes sentences for controlled substance offenses. The Supreme Court, on the other hand, took pains to distinguish the "silence" in 21 U.S.C. § 841 on the crack cocaine-to-powder cocaine quantity ratio from the unambiguous language in 28 U.S.C. § 944(h) requiring "the Sentencing Commission to set Guidelines sentences for serious recidivism offenders 'at or near' the statutory maximum." *Kimbrough,* 128 S. Ct. at 571. In citing *Kimbrough*, the defendant fails to recognizes this key distinction.

Finally, the defendant cites a 7-year old survey of district court judges for the proposition that the majority of the judges thought "the guidelines infrequently met the goal of maintaining sufficient flexibility to permit individualized sentences, or of providing needed training, care or treatment in the most effective manner." Def. Sent. Mem. 14, citing UNITED STATES SENTENCING COMMISSION, SURVEY OF ARTICLE III JUDGES ON THE FEDERAL SENTENCING GUIDELINES, FINAL REPORT (2003) ("Survey"), at http://www.ussc.gov/judsurv/judsurv.htm (and attached thereto). This argument is unavailing for two reasons.

First, this Court can and should make an individualized

5

determination whether and how the career offender provision of the Guidelines applies to <u>this</u> particular case, without relying on the Survey. *See* 18 U.S.C. § 3553(a)(4) (directing sentencing judges to consider the Guidelines); <u>United States v. Thurston</u>, 544 F.3d 22, 24 n.5, 25 (1st Cir. 2008) (improper calculation of a sentence under the Guidelines is a reversible error).

Second, a closer examination of the Survey does not support the defendant's conclusion about the judges' broad experience sentencing under the Guidelines. While the Survey indicates that 41.2% to 45.1% of the judges thought that "fewer" of their sentences under the Guidelines provided "effective rehabilitation" and "flexibility to individualizes sentences," the other 52.1% to 61.7% thought otherwise. SURVEY at Chapter II, Exhibit II-12. Moreover, the judges in the 41.2% to 45.1% category felt the inadequacy of the Guideline sentences applied mostly to unlawful entry, alien smuggling, and drug offenses. *Id.* at Exhibits II-(13-14). On the other hand, only about 12% of the surveyed judges thought their sentences under the Guidelines for the offense of robbery were consistently greater than otherwise would have been appropriate. *Id.* at Exhibit II-4.

Notwithstanding the defendant's mistaken reliance on the Survey or argument that the career offender guideline should be dispensed with, this Court, after the Supreme Court's decisions in *Gall v. United States*, 128 S. Ct. 586 (2007), and *Kimbrough*, 128 S.

Ct. 558, possesses wide discretion in determining whether a career offender designation overstates or understates a defendant's criminal history and likelihood of recidivism. *United States v. Martin*, 520 F.3d 87, 95-96 (1st Cir. 2008) (sentencing court varying from a career offender guideline based on considerations of the defendant's potential for rehabilitation and relative culpability). *See also United States v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009) (the sentencing court possesses discretion to vary from sentencing guidelines based not only on policy disagreements with the Sentencing Commission but also where "a guideline provision is a direct reflection of a congressional directive"). Thus, the government addresses next whether the government's baseline recommendation of a 169-month sentence is appropriate in light of the defendant's offense conduct, criminal history, and recidivism despite access to substance abuse treatment.

**II.   THE GOVERNMENT'S BASELINE RECOMMENDATION OF A 169-MONTH SENTENCE UNDER THE GUIDELINES PROPERLY REFLECTS THE DEFENDANT'S OFFENSE CONDUCT, CRIMINAL HISTORY, AND HIGH RISK OF RECIDIVISM.**

Between April 10, 2006, and May 15, 2006, the defendant robbed eight banks and attempted to rob one bank in the Boston area. PSR ¶ 8-17. He executed the robberies by gratuitously threatening to kill the victim bank tellers or their families. During the April 10, 2006 bank robbery the defendant passed the victim teller a demand note, which stated: "Give me the money or I will kill you."

PSR ¶ 8. During the April 20, 2006 bank robbery the defendant told the victim teller: "There better not be [a dye pack], because if there is, I'll kill you," PSR ¶ 9.  During the April 25, 2006 bank robbery, the defendant passed the victim teller a demand note, which stated: "I will kill you + yo fam," and he told the teller he would be watching the bank and that he would follow her home and kill her and her family if he saw her set off the alarm.  PSR ¶ 10. During the April 27, 2006 bank robbery the defendant told the victim teller to hand over the money "[b]efore I pull my gun and shoot you in the head." PSR ¶ 11.  During the May 1, 2006 bank robbery the defendant told the victim teller: "[D]id you put a dye pack in there?  If you did, I will come back and kill you," PSR ¶ 12.  During the May 5, 2006 bank robbery the defendant threatened to kill the victim teller if she made a scene.  PSR ¶ 13.

By the time of the defendant's last bank robbery in Boston, the investigation by law enforcement was in full force.  The surveillance images of the defendant robbing the banks were posted on the Massachusetts Most Wanted website, and tips from concerned citizens began to pour in.  The FBI identified the defendant as the bank robber but was unable to locate him.  The defendant, presumably aware that he could remain in Massachusetts at his peril, took the bus to New York, where he robbed five more financial institutions, between May 26, 2006, and June 19, 2006. PSR ¶ 119.  The defendant did not turn himself in.  He was finally captured in New York on June 20, 2006, where FBI agents from Boston

confronted him with surveillance images of him robbing the above-mentioned banks.

The defendant's brazen spree of bank robberies in conjunction with his threats to kill the victim tellers and their families calls for a higher than a low-end guideline sentence of 151 months under the career offender provision of the Guidelines, and the government submits that the sentence of 169 months properly reflects the defendant's conduct and his criminal history.

The defendant's request for a 48-month term of imprisonment turns primarily on his history of drug abuse. Throughout his sentencing memorandum the defendant suggests he went untreated for drug addiction not because he sought out treatment but could not find or afford any, but because someone, somehow, somewhere, failed in his or her responsibility to reach out and impose drug treatment upon him. He complaints that he was released in 2001 after serving a three-year sentence on drug distribution charges "with no period of probation to assist him," Def. Sent. Mem. 3, and that his "[a]rrest and a short incarceration in New Hampshire [in 2005] with little follow-up care was ineffective in stemming his by-then florid abuse of heroin," Def. Sent. Mem. 4.

There is no question that the defendant is a life-long substance abuser, that his criminal history has some connection to his substance abuse, and that he would benefit greatly from substance abuse treatment, which he apparently, and admirably, has

undergone with some success at the New York State Department of Corrections. PSR ¶ 175. Yet, there is no evidence whatsoever to suggest that prior to commencing his New York state sentence the defendant sought out treatment, in any form, for his drug addiction. *See generally* PSR ¶¶ 170-176.

In connection with the defendant's release from Massachusetts state custody in 2001, he could have availed himself of various services offered by the Massachusetts Department of Correction. For example, the Department of Correction provides numerous reentry services to individuals who finish a term of incarceration, including "monthly meetings," "within 6 months of release," "in order to identify and develop a reentry plan which addresses the needs of the inmate as he/she prepares for release" and post-release "substance abuse" programs.[2] In addition, 60 days before the release, the inmates are provided with a MassHealth application "to ensure [that] released offenders ha[ve] access to critical mental health, medical and substance abuse treatment."[3] Virtually every released inmate ends up with a MassHealth card.[4] It does not

---

[2] DOC Reentry Services Division Brochure (attached thereto), at http://www.mass.gov/Eeops/docs/doc/friends_and_family_brochure.pdf; and DOC Reentry Continuum Brochure (attached thereto), at http://www.mass.gov/Eeops/docs/doc/reentry_continuum.pdf.

[3] DOC Reentry Services Division Brochure, *supra* note 2.

[4] This information is based on the undersigned counsel's conversation with a supervisor at the Massachusetts Department of Correction.

appear the defendant took advantage of these opportunities.

Moreover, the defendant held a job for only a few months upon his release in 2001. PSR ¶ 182. And even there he appears to have been less than successful, as he was a "no call no show for 3 consecutive scheduled shifts." PSR ¶ 182. In sum, it was not the lack of treatment opportunities or resources but the defendant's inability to employ them to his benefit that was the chief impediment to his sobriety and law-abiding life.

It is precisely because the defendant, in his own words, made the "decision to continue his irresponsible and criminal behavior," Def. Sent. Mem. 9, that ultimately culminated in eight completed and one attempted bank robberies in Massachusetts, not to mention the subsequent five robberies in New York, that this Court should consider the defendant as a career offender under the Guidelines to protect those around the defendant, and the defendant himself, from his impulsive behavior, and to allow the defendant enough time to achieve sobriety and undergo substance abuse counseling. The government recommends that the appropriate sentence under the career offender provision of the Guidelines is a 169-month term of imprisonment.

### III. THE GOVERNMENT RECOMMENDS THAT THE COURT SUBTRACT 38 MONTHS FROM THE BASELINE GUIDELINE SENTENCE OF 169 MONTHS TO ACCOUNT FOR THE DEFENDANT'S TERM OF INCARCERATION IN NEW YORK.

Finally, the government recommends that the Court subtract 38

months from the Guideline sentence of 169 months. As the Probation Officer points out, as of January 29, 2010, the defendant will have served approximately 43 months (1,319 days) in New York state custody and the Bureau of Prisons will give the defendant <u>Willis</u> time credits amounting to 140 days for the time he was incarnated in New York between his arrest on June 20, 2006, and his sentencing on November 7, 2006. PSR p. 44. The effect of this calculation is that by January 29, 2010, the defendant will have served approximately 38 months (1,179 days) of his state sentence for which he will not receive credit from the Bureau of Prisons. *Id.*

The government's recommendation is based on the fact that the defendant was arrested by New York state authorities on June 20, 2006, and sentenced on November 7, 2006; and that the government brought the defendant to the District of Massachusetts for an initial appearance almost three years later, on June 24, 2009, on a writ of habeas corpus ad prosequendum issued by the Honorable Marianne B. Bowler. Had the government brought the defendant before this Court earlier, the Court, if it so wished, could have imposed a sentence on the instant offense to run concurrently or partially concurrently to the defendant's New York state sentence. *See* U.S.S.G. § 5G1.3(c). Consequently, the government considers the 38-month credit appropriate under the circumstances. *See id.* The practical result of the government's recommendation is consistent with the defendant's request that the Court credit the

defendant with the time he already served on the New York sentence. Def. Sent. Mem. 15.[5]

## CONCLUSION

For these reasons, the government respectfully recommends that this Honorable Court sentence the defendant to a **131-month** term of imprisonment to run concurrently to with his state sentence, followed by a 3-year term of supervised release, and order restitution in the amount of $22,757.72.

Respectfully submitted,

CARMEN M. ORTIZ
Acting United States Attorney

By: **/s/ Maxim Grinberg**
MAXIM GRINBERG
Dated:   January 22, 2010         Assistant U.S. Attorney

---

[5] The defendant recommends a 48-month sentence to run consecutive to his current state sentence in New York.  The defendant's New York state sentence conditionally expires on June 15, 2010, but no later than June 15, 2012.  PSR ¶ 119.  If in fact the defendant's sentence will expire in 2012, the defendant may effectively be recommending roughly a 6- and not a 4-year sentence.  Because the government recommends a 131-month sentence to run concurrently with the state sentence, the expiration of the defendant's state sentence does not affect the government recommendation.

**CERTIFICATE OF SERVICE**

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 22, 2010.

                                        **/s/ Maxim Grinberg**
                                        MAXIM GRINBERG